UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

M.G., a minor,

                Plaintiff,                      Civil Action No. 10-cv-12957

        v.                             District Judge Mark A. Goldsmith
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [17, 21]**

Plaintiff M.G., a child, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions, (Dkts. 17, 21) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (Dkts. 4, 16).

## I. RECOMMENDATION

For the reasons set forth below, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

Plaintiff applied for SSI on August 8, 2006 asserting a disability onset date of July 28, 2006. (Tr. 102.)  The Commissioner denied Plaintiff's disability application on October 2, 2006. (Tr. 26, 59.)  Plaintiff then filed a request for a hearing, and on April 28, 2009, Plaintiff (along with his mother and counselor) appeared without counsel before Administrative Law Judge ("ALJ") John L. Mondi, who considered the case *de novo*.  (Tr. 48-58.)  In a May 19, 2009 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 26-36.)  The ALJ's decision became the final decision of the Commissioner on May 25, 2010 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on July 27, 2010.

### B. Background

Plaintiff, who has been diagnosed with Asperger syndrome ("AS"),[1] was 10 years old on the

---

[1] The National Institutes of Health provides that Asperger syndrome is characterized by
* limited interests or an unusual preoccupation with a particular subject to the exclusion of other activities;
* repetitive routines or rituals;
* peculiarities in speech and language, such as speaking in an overly formal manner or in a monotone, or taking figures of speech literally;
* socially and emotionally inappropriate behavior and the inability to interact successfully with peers;
* problems with non-verbal communication, including the restricted use of gestures, limited or inappropriate facial expressions, or a peculiar, stiff gaze clumsy and uncoordinated motor movements.

AS is an autism spectrum disorder (ASD), one of a distinct group of neurological conditions characterized by a greater or lesser degree of impairment in language and communication skills, as well as repetitive or restrictive patterns of thought and behavior.  Other ASDs include:  classic autism, Rett syndrome, childhood disintegrative disorder, and pervasive developmental disorder not otherwise specified (usually referred to as PDD-NOS). . . .

2

alleged onset date and 12 years old when he appeared for his hearing before the ALJ.  (Tr. 48, 102.)

He was in the seventh grade at that time.  (Tr. 50.)

---

The most distinguishing symptom of AS is a child's obsessive interest in a single object or topic to the exclusion of any other. Some children with AS have become experts on vacuum cleaners, makes and models of cars, even objects as odd as deep fat fryers. Children with AS want to know everything about their topic of interest and their conversations with others will be about little else. Their expertise, high level of vocabulary, and formal speech patterns make them seem like little professors.

Children with AS will gather enormous amounts of factual information about their favorite subject and will talk incessantly about it, but the conversation may seem like a random collection of facts or statistics, with no point or conclusion.

Their speech may be marked by a lack of rhythm, an odd inflection, or a monotone pitch.  Children with AS often lack the ability to modulate the volume of their voice to match their surroundings.  For example, they will have to be reminded to talk softly every time they enter a library or a movie theatre. . . .

Unlike the severe withdrawal from the rest of the world that is characteristic of autism, children with AS are isolated because of their poor social skills and narrow interests.  In fact, they may approach other people, but make normal conversation impossible by inappropriate or eccentric behavior, or by wanting only to talk about their singular interest.

National Institutes of Health, National Institute of Neurlogical Disorders and Stroke, *Asperger Syndrome Fact Sheet* (June 15, 2011), http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm; *see also* Dorland's Illustrated Medical Dictionary 1848 (31 ed. 2007) (defining Asperger's as "a pervasive developmental disorder resembling autistic disorder, being characterized by severe impairment of social interactions and by restricted interests and behaviors, but lacking the delays in development of language, cognitive function and self-help skills that additionally define autistic disorder.  It may be equivalent to a high-functioning form of autistic disorder.").

### 1. *The April 28, 2009 Hearing Before the ALJ*

#### a. *Plaintiff's Testimony*

Plaintiff testified very briefly before the ALJ. When the ALJ asked how things were going in school, Plaintiff responded, "average." (Tr. 50.) He said that his grades were "pretty good" but that he participated in no extracurricular activities. (Tr. 50.) Plaintiff stated that he had friends and that they did "average teenage stuff" together, including going into some woods nearby Plaintiff's house. (Tr. 51.) Plaintiff also testified that he played computer games. (Tr. 51.)

#### b. *Plaintiff's Mother's Testimony*

Plaintiff's mother, Ms. G., began her testimony by stating that not everything Plaintiff testified to was completely accurate. (Tr. 51.) In particular, she clarified, "There aren't kids in the neighborhood that he's friends with. He does have problems at school with children." (Tr. 51.) She further explained, "Unfortunately[,] I think he thinks people are his friends and they're not." (Tr. 53.) In further discussing Plaintiff's relationships with others, she testified that Plaintiff is the oldest of her three sons and that "[h]e fights a lot with them." (*Id.*)

Regarding school performance, Ms. G. testified that Plaintiff is "very bright, but he's not getting very good grades right now." (Tr. 52.) She explained that Plaintiff only "sometimes" does his homework and "says it's done but it's not." (Tr. 52-53.) As for outside school activities, Ms. G. testified that plaintiff "chooses to be alone in his room reading or on the computer searching things on the internet, watching mov[ies], watching TV, very infrequently goes outside." (*Id.*)

Plaintiff's mother told the ALJ that Plaintiff was taking three medications: Trileptal,

4

Risperdal, Lexapro. (Tr. 52.)[2]  When asked if the medication helped Plaintiff, Ms. G. replied, "Somewhat.  It's hard to say.  There's still a ton of room for improvement."  (Tr. 53.)

### c. Plaintiff's Counselor's Testimony

Ann Liesen, a counselor with the Macomb-Oakland Regional Center, also testified at Plaintiff's disability hearing.  Liesen testified that she had provided counseling for Plaintiff for over four years and also observed Plaintiff in class, at his home, and in "other" social situations. (Tr. 55.) At the time of the hearing, Liesen was observing Plaintiff two to four times a month. (Tr. 56.)

Liesen explained that Plaintiff has "great difficulty" getting along with his peers, and that he "gravitates towards adults who are more tolerant of his behaviors."  (Tr. 56.)  She further explained,

> [M.G.] is frequently on the receiving end of teasing and scape-goating in school in part because he has a very overzealous reaction when he's feeling stressed and will have outbursts which are not funny to adults, but very entertaining for his peers.  He has a very rigid idea of right and wrong in the world and when he comes up against anything that in his mind is wrong he overreacts in those situations, which makes it difficult for him to negotiate, take turns, even work through difficulties with his teachers.

(Tr. 56.)  She noted that Plaintiff has made progress in self-regulating his emotions and taking a break to calm down, "but he's still highly susceptible to being overwhelmed and having emotional outbursts."  (Tr. 56.)

Like Plaintiff's mother, Liesen described Plaintiff as "brilliant" but stated that he has

---

[2]It appears that Risperdal was prescribed for depression and Trileptal for mood stabilization (anti-psychotic). (Tr. 116, 144.)  "Lexapro . . . is a selective serotonin reuptake inhibitor . . . indicated for the acute and maintenance treatment of major depressive disorder (MDD) in adults and in adolescents aged 12-17 years."  Lexapro Homepage, http://www.lexapro.com/ (last checked August 26, 2011).  Plaintiff was also prescribed Zoloft for depression at one point. (Tr. 116, 144.)

"splinter" skills: "very advanced in certain areas, lacking in others." (Tr. 56.) Liesen said that one lacking area was organization which causes Plaintiff to not hand in assignments. (Tr. 57.) This in turn triggers anxiety and emotional outbursts. (*Id.*) She concluded that Plaintiff's "key difficulties" were interacting and perceiving the social world and organization. (*Id.*)

### 2. Medical Evidence and School Reports and Evaluations

On January 20, 2005, Carol Schmitz, a speech and language pathologist, evaluated Plaintiff, then eight years old, for special education services. (Tr. 253.) She found that Plaintiff's word usage and sentence structure were above average and concluded that Plaintiff did not qualify for special education services (at least for language reasons). (Tr. 254.)

On January 26, 2005, Jennifer Friedman, Ph.D., reviewed a psychological evaluation of Plaintiff completed by Michael Behen, Ph.D. in October 2004. Behen had performed a number of psychological tests on Plaintiff and found, for example, that on the Wide Range Achievement Test Third Edition, Plaintiff scored well above the mean of 100: 143 in reading, 129 in spelling, and 117 in arithmetic. (Tr. 261.)[3] Dr. Friedman's opinion was that Dr. Behen's results were reliable "especially for purposes related to school." (*Id.*)

On February 1, 2005, Sheri Stuart, a teacher consultant, conducted an "Educational Evaluation" of Plaintiff. (Tr. 250-52.) She observed Plaintiff in his third-grade class and noted that when the teacher asked Plaintiff to play a group math game, he responded that it would be too stressful. (Tr. 250.) Later, when a disagreement arose while playing the game, "[h]e closed his

_____

[3]Scores of 130 and above are "very superior," 120-129 "superior," and 110-119 "high average." E.D. Knight, J.B. Smith, L. M. Martin *et al.*, *Measures for Assessment of Functioning and Outcomes in Longitudinal Research on Child Abuse and Neglect Volume 4: Middle Adolescence (Age 16)*, WRAT3, http://www.iprc.unc.edu/longscan/pages/measures/Age16/.

book, lay on the carpet and started crying." (Tr. 250.) Stuart would later rate Plaintiff as "poor" in the categories of "response to instruction," "frustration tolerance," and "ability to follow directions." (Tr. 248.) Stuart administered The Woodcock Johnson Test of Achievement III and found that in reading, math, and writing his scores were above average. (Tr. 251-52.) In terms of spelling, Plaintiff's ability "was consistent with beginning twelfth-grade level." (Tr. 252.) She noted, "Classroom observations, report cards, attendance records and teacher interviews indicate that [M.G.] had been provided with a learning experience appropriate with age and ability levels. Any severe discrepancy is not primarily the result of vision, physical impairment, mental retardation, emotional disturbance, autism, environmental, cultural, or economic differences." (Tr. 252.)

Over the next two days, on February 2 and February 3, 2005, Dr. Friedman performed a psychological evaluation of Plaintiff. (Tr. 258.) Dr. Friedman's testing revealed moderate levels of depression and suggested "extreme anxiety." (Tr. 259.) He opined "it is evident that [M.G.] is experiencing significant difficulty in many areas of emotional and behavioral functioning, and he is in need of immediate assistance to address these concerns." (Tr. 260.) Dr. Friedman concluded, "it appears that [M.G.] may be eligible for certification as an Emotionally Impaired student, as his inappropriate emotions and behaviors appear to be the main interference with his school performance. However, consideration will also be given to his recent diagnosis of Asperger's Disorder." (Tr. 260.)

On February 4, 2005, certified social worker Laura Olesko completed a "School Social Work Report" for Plaintiff. (Tr. 255-263.) A couple weeks earlier, she had observed Plaintiff in this third-grade class. (Tr. 255-56.) There, Plaintiff's teacher told Olesko that there had been "some improvement in [M.G.'s] ability to function over the last few months." (Tr. 256.) But Olesko noted,

Plaintiff "still may argue with the teacher when she makes a suggestion to him and [he] makes negative comments aloud." (Tr. 256.) She also remarked that Plaintiff appeared to be provoked by "innocuous things" like when his younger brother said "hi" to him while Plaintiff was on the computer. (Tr. 256.) Olesko concluded that while Plaintiff "displays some behaviors characteristic of a student with a disorder in the autism spectrum, at this point he appears to more accurately meet the criteria for identification as a student with an emotional impairment." (Tr. 263.)

On February 9, 2005, a Walled Lake Schools multi-disciplinary team that included Dr. Friedman, Stuart, Olesko, and Plaintiff's third-grade teacher completed several reports regarding Plaintiff. An "Emotional Impairment" report provides that Plaintiff had the inability to build or maintain satisfactory interpersonal relationships within the school environment, had inappropriate behavior or feelings under normal circumstances, and manifested a general pervasive mood of unhappiness or depression. (Tr. 242.) The multi-disciplinary team also completed an "Autism Spectrum Disorder" form which provides that Plaintiff had (1) qualitative impairments in reciprocal social interactions, including, (a) a marked impairment in the use of multiple nonverbal behaviors (such as eye-to-eye gaze), (b) a failure to develop peer relationships, and (c) a marked impairment in the area of social or emotional reciprocity; (2) qualitative impairments in communication, including (a) a marked impairment in the ability to initiate or sustain a reciprocal conversation with others, and (b) a lack of varied, spontaneous make-believe play or social imitative play. (Tr. 246.) However, because the team found that Plaintiff did not have restricted, repetitive and stereotyped behaviors, they concluded that Plaintiff was not eligible for special education because of an autism spectrum disorder. (Tr. 246.) Instead, they found Plaintiff eligible for special education because of an emotional impairment. (Tr. 217, 246.) Plaintiff's parents disagreed with the conclusion that

an autism-based certification was not warranted.  (Tr. 217.)

On April 26, 2005, a Walled Lakes School multi-disciplinary team (consisting of some of the same assessors as before) completed additional reports for Plaintiff.  (Tr. 222-29.)  An Individualized Education Program Team ("IEPT") report provided that Plaintiff

> has been diagnosed with pervasive developmental disorder.  This affects his social skills, behavior, and interpreting verbal information.  He also has delays in motor skills. [M.G.] is a very bright student with good academic skills.  However, he has difficulties performing and completing assignments in the classroom.

(Tr. 223.)  The report further provided that Plaintiff had a decreased ability to regulate his arousal level. (Tr. 225.)  The evaluation team also concluded that special education or related services were necessary.  (Tr. 228-29.)

On June 1, 2005, an Oakland Schools evaluation team, consisting of a school social worker, speech and language consultant, and a school psychologist, provided a second opinion regarding Plaintiff's eligibility for autism certification.  (Tr. 217.)  They found that Plaintiff had: (1) a long history of behavioral, emotional, and social difference; (2) qualitative impairments in reciprocal social interactions including nonverbal behaviors, peer relationships, and social/emotional reciprocity; (3) qualitative impairments in communication including lack of varied and social and imitative play; and, unlike the Walled Lake Schools evaluation team, (4) preoccupation with restricted interests as well as inflexible adherence to routines and rituals.  (Tr. 217.)  Based on these findings, the Oakland Schools team concluded that Plaintiff met the eligibility criteria for an autism spectrum disorder.  (Tr. 217.)

On June 8, 2005, a Walled Lake Schools multi-disciplinary team completed a second "Autism Spectrum Disorder" report. (Tr. 207.)  They found the same impairments indicated in the

February 2005 report, but made additional findings consistent with the Oakland Schools team's opinion: preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity and focus, and apparently inflexible adherence to specific, nonfunctional routines or rituals. (Tr. 207.) The multi-disciplinary team also completed another IEPT report that day and noted that "[M.G.'s] autism disorder impedes his ability to function in the general education classrooms. He has difficulty completing classroom assignments in all subject areas. Also, due to fine motor delays, [M.G.] has difficulties completing written assignments." (Tr. 185.)

On August 29, 2006, Dr. Richard Atkins, a psychiatrist, noted Plaintiff's medications of Zoloft, Trileptal, and Risperdal. (Tr. 267.) He remarked that Plaintiff's mood was improved with less anxiety, mood swings, and impulsivity. (*Id.*) He diagnosed Plaintiff with Asperger's syndrome and prescribed medication to help Plaintiff sleep. (*Id.*)

On October 2, 2006, Paul Lui, D.O., completed a Childhood Disability Evaluation Form on behalf of the State Disability Determination Services ("DDS"). He found that Plaintiff had the severe impairment of Asperger's disorder, but that this impairment did not meet, medically equal, or functionally equal any listed impairment. (Tr. 270.) Regarding the six functional domains used to determine functional equivalency (discussed below) Dr. Lui found that Plaintiff had no limitations in either acquiring and using information or health and physical well being, and had less than marked limitations in attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and self-care. (Tr. 273.)

Part of an April 24, 2008 IEPT report appears in the record. The report provides that Plaintiff "is easily frustrated and is highly anxious when completing assignments." (Tr. 278.) The report also notes that Plaintiff would not take part in the National Assessment of Educational

10

Performance test because of his anxiety.  (Tr. 282.)

In December 2008, Ann Liesen, the counselor who testified at Plaintiff's hearing, met with Plaintiff's mother to discuss a "Person Centered Plan" ("PCP") (which was developed in part by Dr. Atkins).  (Tr. 286-87.)  Liesen noted that Plaintiff taught himself to read, and prided himself in his advanced reading ability.  (Tr. 286.)  She also noted that Plaintiff's "tolerance of others and ability to compromise continues to be an area of needed practice" (Tr. 286), and that Plaintiff "demonstrates social impairment in areas of empathic reasoning.  He tends to have difficulties understanding how his words/actions affect others and [has] difficulties understanding other's perspectives," (Tr. 290).  Liesen remarked that because of Plaintiff's social impairment, "he struggles initiating and maintaining positive relationships with his peers and become[s] easily frustrated, emotionally dramatic, or resorts to isolation."  (Tr. 290.)

On January 22, 2009, Dr. Atkins, who by that time had been treating Plaintiff for three or four years, wrote a letter explaining that Plaintiff "is diagnosed with [A]sperger's syndrome with depression and emotional lability."  (Tr. 276.)  He also noted that Plaintiff's limitations include "extreme sensitivity and problems with social interactions."  (Tr. 276.)

### 3.  Disability Forms Completed For Social Security Benefits

On August 30, 2006, one of Plaintiff's fourth-grade teachers, Melanie McFadden, completed a "Teacher Questionnaire" in connection with Plaintiff's application for SSI.  (Tr. 131-38.)  She provided that she taught Plaintiff math and science and had known Plaintiff for two years.  (Tr. 131.)  In the category of attending and completing tasks, McFadden indicated that Plaintiff had "no problem" in the vast majority of subcategories, including, paying attention, focusing long enough to finish an assigned activity, refocusing when necessary, and carrying out multi-step instructions.

11

(Tr. 133.)[4]  She indicated "a very serious problem" in "working without distracting self or others," however.  She also noted that Plaintiff has "meltdowns at times and at these times he is very disruptive to others." (*Id.*)  In terms of interacting and relating with others, McFadden also indicated "no problem" for a majority of the subcategories.  (Tr. 134.)  She provided, however, that Plaintiff had "a serious problem" in the subcategory of playing cooperatively.  (Tr. 134.)  In terms of caring for himself, McFadden indicated that Plaintiff has "very serious problem[s]" in handling frustration and responding appropriately to changes in his mood (e.g., calming self).  (Tr. 136.)  She also provided that Plaintiff had "a serious problem" in using the appropriate coping skills to handle the demands of the school environment.  (Tr. 136.)

On September 8, 2006, Plaintiff's mother completed a "Daily Activities" form in connection with Plaintiff's disability application.  There, Ms. G. said that after school, Plaintiff "comes home and goes directly in his room to read and relax.  He will do that, watch TV or play on the computer for hours." (Tr. 123.)  She described Plaintiff as  "an excellent reader." (Tr. 126.)  She noted that Plaintiff had three friends whom Plaintiff can play with for an hour-and-a-half before requiring a break.  (*Id.*)  She provided that as far as chores, Plaintiff helps with dishes, puts away his dirty clothes, and keeps his room clean.  (Tr. 124.)  In terms of personal hygiene, she noted that Plaintiff sometimes has difficulty wiping himself after defecating.  (Tr. 124.)

---

[4]The form asked McFadden to rate Plaintiff on a number of functions as compared to children his age without impairments.  (Tr. 132.)  The rating key escalated as follows: "no problem," "a slight problem," "an obvious problem," "a serious problem," and, lastly, "a very serious problem." (Tr. 132.)

### C. Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. § 416.926a. "Medical equivalency is covered by 20 C.F.R. § 416.926; functional equivalency is covered by Section 416.926a." *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003).

13

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio 2009) (citing 20 C.F.R. § 416.926(a)).  A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20 C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926.  "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability.  If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Emeonye v. Astrue*, No. 04-03386, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008).

Regarding functional equivalence, there are six "domains" that an ALJ considers: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and

14

physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations in two of the six. *See* 20 C.F.R. § 416.926a(d). In turn, a "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

### D. The Administrative Law Judge's Findings

At Step One, the ALJ found that Plaintiff has never engaged in substantial gainful activity. (Tr. 29.) At Step Two, the ALJ found that Plaintiff had the following severe impairment: Asperger Syndrome (autism spectrum disorder). (Tr. 29.) At Step Three, the ALJ concluded that this impairment did not meet or medically equal any Listing. (Tr. 29-30.) The ALJ also found that Plaintiff did not functionally equal any listing finding that Plaintiff only had "marked" limitations in the domain of "interacting and relating with others" and "no limitation" or "less than marked" limitations in the other five domains. (Tr. 30-35.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must

15

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human*

*Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F. Analysis

#### 1. The ALJ Provided An Inadequate Meets or Medically Equals Analysis

Plaintiff argues primarily that he meets or medically equals Listing 112.10: Autistic Disorder and Other Pervasive Developmental Disorders. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. To meet Listing 112.10, the claimant must establish all of the following "A" criteria:

> For autistic disorder:
>
> a. Qualitative deficits in the development of reciprocal social interaction;
> b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity; and
> c. Markedly restricted repertoire of activities and interests.
>
> For other pervasive developmental disorders:
>
> a. Qualitative deficits in the development of reciprocal social interaction; and
> b. Qualitative deficits in verbal and nonverbal communication and in imaginative activity.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.10. Further, Plaintiff must have a "marked" impairment or difficulty in at least two of the following four "B" criteria:

> a. age-appropriate cognitive/communicative function;
> b. age-appropriate social functioning;
> c. age-appropriate personal functioning;
> d. maintaining concentration, persistence, or pace.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listings 112.02, 112.10. Plaintiff asserts that the evidence

of record "overwhelmingly" demonstrates that Plaintiff meets Listing 112.10.  (Pl.'s Mot. Summ. J. at 17.)[5]

The Commissioner responds that because Plaintiff has simply listed evidence under certain elements of Listing 112.10, Plaintiff is impermissibly "inviting this Court to re-weigh the evidence, which it should decline to do."  (Def.'s Mot. Summ. J. at 13.)  The Commissioner is correct that in this case this Court sits as an appellate tribunal, and, as such, it neither reviews the evidence *do novo* nor resolves conflicts in the evidence.  *See e.g.*, *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).  The Court's role is to determine whether the ALJ's opinion is supported by substantial evidence.  However, in determining that Plaintiff did not meet or medically equal a listed impairment, the ALJ provided this Court with the following conclusory analysis:

> A medical consultant for the [State DDS] found . . . that the claimant's Asperger Syndrome was a "severe" impairment but did not meet or medically equal any impairment in the [Listings] or result in functional imitations that equaled a listed impairment.
>
> Following a hearing and receipt of additional evidence, the record is consistent with the DDS consultant's assessment.

(Tr. 30 (internal citations omitted).)  As is plain from the quoted passage, the ALJ did not cite, discuss, or resolve any conflicts in the evidence in concluding that Plaintiff's mental impairment did not meet or medically equal a Listing.  Nor did the ALJ even identify which Listing(s) Plaintiff's impairments were compared with.  And this omission is not cured by examining the State DDS physician's opinion: he too identified no Listing while concluding that Plaintiff met none of them.

---

[5]The Court takes this opportunity to advise the parties that it thoroughly reviews summary judgment briefs, and thus, neither needs nor desires extensive bolding or italicizing throughout those briefs.  *See* Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 122 (1st ed. 2008).

18

(Tr. 270.)

When faced with similarly conclusory meets or medically equals analysis, courts have found that the ALJ's narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact:

> In this case, the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment. . . . Such a bare conclusion is beyond meaningful judicial review. Under the Social Security Act,
>
> > [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.
>
> 42 U.S.C. 405(b)(1). Under this statute, the ALJ was required to discuss the evidence and explain why he found that appellant was not disabled at step three.
>
> This statutory requirement fits hand in glove with our standard of review. By congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration. Rather, we review the Secretary's decision only to determine whether her factual findings are supported by substantial evidence and whether she applied the correct legal standards.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see also Miller v. Comm'r of Soc. Sec.*, 181 F. Supp. 2d 816, 820 (S.D. Ohio 2001) (citing *Clifton* with approval and explaining, "[t]he Commissioner argues that the error in this case, if any, was made by plaintiff, who failed to satisfy

his Step 3 burden of coming forward with evidence to prove that he was disabled under the Listings. . . . [W]hether or not plaintiff came forward with the requisite evidence at Step 3, the ALJ was required to discuss that evidence, relative to the Listings, as required by *Clifton*.  As noted above, the ALJ failed to do so, thus meriting a sentence four remand."); *Torres v. Comm'r of Soc. Sec.*, 279 F. App'x 149, 151-52 (3d Cir. 2008) ("This court has stated that it is the ALJ's responsibility to identify the relevant listed impairment(s) and develop the arguments both for and against granting benefits." (internal quotation marks, alterations, and citation omitted)); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) ("As we have recently noted, failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand."); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000) ("Because we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting a determination that Burnett's 'severe' impairment does not meet or is not equivalent to a listed impairment."); *Sorenson v. Astrue*, No. 10-C-0582, 2011 WL 1043362, at \*9-11,  (E.D. Wis. Mar. 18, 2011) (finding that ALJ's explanation that state DDS physicians reached a conclusion that the plaintiff did not "medically meet or equal a listed impairment" was "perfunctory" articulation where ALJ failed to identify any specific Listing used for comparison); *cf. Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at \*3-4 (6th Cir. Apr. 1, 2011) (remanding where ALJ performed step three analysis for mental impairment but not for physical impairments, citing *Clifton* and *Burnett* with approval, and noting, "In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was

supported by substantial evidence.").[6]

While some authority suggests that remand is justified based on this procedural lapse alone, *see e.g., Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996), this Court acknowledges that it may overlook the ALJ's failure to articulate his Step Three findings if the error is harmless in nature. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) ("As a general rule, we have held that an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside

---

[6]The Court acknowledges that the ALJ need not "spell[] out every consideration that went into the step three determination" and that, in some cases, factual findings elsewhere in the narrative may suffice as factual findings at Step Three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (holding, where "ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings," that limited Step Three explanation was sufficient). But to the extent that the Commissioner would assert that the ALJ's analysis regarding functional equivalence suffices for the required "meets" and "medically equals" analysis, there is case law to the contrary. *See Alworden ex rel. K.L.A. v. Comm'r of Soc. Sec.*, No. 1:09-cv-1040, 2011 WL 1118611, at *6 (W.D. Mich. Jan. 24, 2011) *adopted by* 2011 WL 1102848 (W.D. Mich. Mar. 25, 2011) ("While the ALJ's decision provides a lengthy discussion of whether plaintiff's condition is functionally equivalent to a listing under 20 C.F.R. § 416.926a, he failed to provide a meaningful discussion of whether plaintiff's condition met the requirements of Listing 112.06 A.3. . . . "); *Veiga ex rel. I.J.M. v. Astrue*, No. 8:07-CV-1001, 2008 WL 4371330, at *10 (M.D. Fla. Sept. 19, 2008) ("[T]he Commissioner cannot rely on the ALJ's detailed discussion of functional equivalence to support the ALJ's findings that Claimant did not meet or medical equal any Listing. The only detailed explanation of the ALJ's findings regarding Claimant's impairments is set out in the ALJ's discussion of the six domains of functional limitations which must be considered in determining functional equivalence. However, the ALJ is required to evaluate and make separate determinations on whether Claimant's impairments meet, medically equal, or functionally equal the Listing."); *Pena ex rel. Pena v. Barnhart*, No. 01C50455, 2002 WL 31527202, at *13 (N.D. Ill. Nov. 13, 2002) ("Before the ALJ can move onto the six domains of functioning, as he did in his opinion, the ALJ must go through the process to determine whether Plaintiff can or cannot satisfy the listing for ADHD. [The Court] is not suggesting the ALJ's determination, that the severity of Plaintiff's ADHD does not satisfy the requirements in Listing 112.11, is incorrect, but only that greater elaboration is necessary."). Moreover, here, (1) the Commissioner has not argued that the functional domain factual findings are the same as the findings necessary for a "meets" or "medically equals" analysis; (2) such equivalence is not readily apparent to this Court; and (3) some of the factual findings in the functional equivalence analysis are themselves conclusory and cite only some of the relevant evidence pertaining to the particular domain (e.g., "attending and completing tasks").

an administrative finding' where the record supports the overall determination."); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality"); *Reynolds*, 2011 WL 1228165, at *3-4 ("[I]n this case, correction of [the ALJ's Step Three failure to articulate] is not merely a formalistic matter of procedure, for it is *possible* that the evidence Reynolds put forth could meet this listing." (emphasis added)). In fact, the Sixth Circuit's decision in *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009), while dealing with a related yet different procedural requirement, is instructive on this issue.

In *Rabbers*, the ALJ failed to apply a regulation-mandated "special technique" for evaluating mental impairments at Step Three. 582 F.3d at 654. In particular, the applicable regulations required the ALJ to, *inter alia*, "'record the presence or absence of the criteria [of the listing] and the rating of the degree of functional limitation.'" *Id.* at 654 (quoting 20 C.F.R. § 404.1420a(d)(2)). Yet the ALJ "neglect[ed] to make specific B criteria findings as required under § 404.1520a(e)(2)." *Id.* at 654. In holding that the ALJ's error could be overlooked as harmless, the Sixth Circuit explained,

> Generally, . . . we review decisions of administrative agencies for harmless error. . . . Accordingly, if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."

*Id.* at 654. Regarding the particular procedural error before it, the appellate court reasoned that it was distinct from a violation of the explanatory requirement of the treating physician rule for which courts apply a "circumscribed" harmless error review:

> If an ALJ rejects a treating physician's opinion but gives no reasons

22

> for doing so, it is difficult for a reviewing court to conduct its own analysis and make a judgment as to what the ALJ's reasons would have been – unless . . . the treating physician's opinion is "so patently deficient that the Commissioner could not possibly credit it." Faced with an ALJ's failure to address the B criteria, however, a reviewing court need only ask whether the record indicates that the claimant's mental impairment would have ultimately satisfied the B criteria. This kind of evidence – evidence regarding the claimant's activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation – is objective, concrete factual and medical evidence that will be apparent in the record, at least in some cases.

*Id.* at 656-57 (internal citation omitted).

Accordingly, this Court will review the record to determine whether the ALJ's failure to analyze the elements of Listing 112.10 is harmless. In so doing, however, this Court emphasizes that it will not shift from its primary role as a reviewer of fact nor find an ALJ's procedural error harmless merely because substantial evidence exists in the record that could uphold the ALJ's decision. As aptly explained by a court in this Circuit:

> The Commissioner interprets *Rabbers* to require reviewing courts to affirm the ALJ's conclusion so long as it is supported by substantial evidence. . . . Yet *Rabbers* specifically held that an ALJ's decision will be reversed when it prejudices the claimant on the merits, "even if supported by substantial evidence." *Rabbers*, 582 F.3d at 651 (emphasis added). . . . [T]o read *Rabbers* as the Commissioner proposes would immunize an ALJ's decision from review whenever the ALJ *could have* found on the record that the claimant was not disabled. Instead, *Rabbers* holds that an error is harmless only when "concrete factual and medical evidence" is "apparent in the record" and shows that even if the ALJ had made the required findings, the ALJ *would have* found the claimant not disabled. . . . This is no trivial distinction, but goes to the very heart of administrative adjudication. If the reviewing court were permitted to affirm any outcome that could have been supported by the evidence, it would propel the court into the domain which Congress has set aside exclusively for the administrative agency.
>
> Thus, the harmless error inquiry turns on whether the ALJ *would*

23

> *have* reached the same conclusions at steps two and three even if he had made the "B" criteria findings. A reviewing court must "exercise caution" when undertaking this inquiry. As the *Rabbers* court warned, it may be difficult or impossible to determine whether an error is harmless when the record contains "conflicting or inconclusive evidence" not resolved by the ALJ or "evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider." *Rabbers*, 582 F.3d at 657-68. In such cases, the court is unable to review the ALJ's decision, and is instead left to speculate as to how the ALJ might have weighed that evidence.

*Juarez v. Astrue*, No. 2:09-cv-160, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010) (some internal citations, quotations, and alterations omitted); *see also Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *8-9 (N.D. Ohio June 3, 2010) ("[C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's decision *post hoc* even when substantial evidence exists to support the ALJ's decision.").

Here, the Court cannot say with confidence that the same disability outcome "would have" resulted had the ALJ performed a more rigorous "meets" or "medically equals" analysis. Regarding the "A" criteria of Listing 112.10, both the Oakland Schools multi-disciplinary team and the Walled Lake Schools multi-disciplinary team made findings that suggest Plaintiff could meet the "autistic disorder" A criteria – or, even if not, could demonstrate "medical equivalence." *Compare* (Tr. 207, 217, 246) *with* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.10. In particular, the two teams found that Plaintiff had qualitative impairments in reciprocal social interactions (including multiple nonverbal behaviors, peer relationships, and social/emotional reciprocity); qualitative impairments in communication (including lack of varied and social and imitative play); and, preoccupation with restricted interests as well as inflexible adherence to routines and rituals. (*See* Tr. 207, 217.) And the relevant "A" criteria are: qualitative deficits in the development of reciprocal social interaction; qualitative deficits in verbal and nonverbal communication and in imaginative activity; and

24

markedly restricted repertoire of activities and interests.  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.10.[7]

Turning to the "B" criteria, the Commissioner concedes (Def.'s Mot. Summ. J. at 15), and the ALJ apparently found (Tr. 31), that Plaintiff had a marked limitation in the B criterion of age-appropriate social functioning.  But the Commissioner asserts that the evidence of record cannot support a finding of a marked limitation in any of the remaining three B criteria: age-appropriate cognitive/communicative function, age-appropriate personal functioning, and maintaining concentration, persistence, or pace.  This Court disagrees: Plaintiff has pointed to sufficient favorable evidence in at least two of these criteria for this Court to harbor doubt as to the outcome on remand.

The category age-appropriate personal functioning "pertains to self-care; i.e., personal needs, health, and safety (feeding, dressing, toileting, bathing; maintaining personal hygiene, proper nutrition, sleep, health habits; adhering to medication or therapy regimens; following safety precautions)."  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.00(C)(2)(c).  In this regard, Plaintiff points out that (1) at age nine he still ate erasers and put non-food items in his mouth (Tr. 255, 257), (2) his treating physician has prescribed medication to aid in sleeping (Tr. 267), (3) at age 10 he still had difficulty putting on snowpants and boots (Tr. 136), (4) at age 10 he still had difficulty wiping himself after he defecates (Tr. 124), and (5) his teacher found that Plaintiff had some significant problems within the category of "caring for himself or herself," in particular, handling frustration,

_____

[7]For purposes of the present analysis this Court may assume, without deciding, that Plaintiff was required to meet the three "A" criteria for "autistic disorder" as opposed to, as argued by Plaintiff, the subset of two "A" criteria for other pervasive development disorders.  On remand, the ALJ should be explicit as to which part of the Listing applies.

using appropriate coping skills to meet the demands of his school environment, and knowing when

to ask for help (Tr. 136).  The ALJ did not discuss any of this evidence.

Turning to the "deficiencies of concentration, persistence, or pace resulting in failure to

complete tasks in a timely manner" criterion, the Listings provide that the "intent" of this element

> is to identify the child who cannot adequately function in primary
> school because of a mental impairment.  Although grades and the
> need for special education placement are relevant factors which must
> be considered in reaching a decision . . . they are not conclusive.
> There is too much variability from school district to school district in
> the expected level of grading and in the criteria for special education
> placement to justify reliance solely on these factors.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.00(C)(3).  The Commissioner emphasizes that

"although, Plaintiff was apparently not achieving up to his potential in school due to his condition,

there is no indication that he could not adequately function in school."  (Def.'s Mot. Summ. J. at 16;

*see also id.* at 17.)  The Court acknowledges that the record reflects that Plaintiff is "brilliant," has,

at least in some areas, performed at or above grade level, and that Plaintiff spent only limited time

in special education per week.  Yet, as Listing 112.00(C)(3) states, grades and special education

placement are not the sole evidence to be considered in regards to the concentration, persistence, or

pace criterion.  Thus, the Court also notes, that (1) the Michigan Educational Assessment Test was

to be administered to Plaintiff in a one-on-one setting because of Plaintiff's anxiety, the need for

directions to be rephrased, and Plaintiff's need for breaks (Tr. 280); (2) during his psychological

evaluation with Dr. Friedman, Plaintiff's "attention fluctuated" and he "had difficulty staying on one

topic" (Tr. 259); (3) during his evaluation with Olesko Plaintiff "frequently made comments that

were off topic" and "jumped from topic to topic" but was responsive to efforts redirect his attention

(Tr. 259-60); (4) during his education evaluation with Stuart – where Plaintiff scored above average

on an IQ-type test – he "required frequent breaks and became frustrated at times" (Tr. 251); and (5) the Walled Lake Schools multi-disciplinary team noted that Plaintiff had difficulty performing and completing assignments in the classroom (Tr. 223).

Admittedly, when the record is considered as a whole, the foregoing is not overwhelming evidence that Plaintiff has "marked" limitations in either the age-appropriate personal functioning criterion or concentration, persistence, or pace criterion.  But again, given the deficiencies in the ALJ's narrative, the question is not simply whether the ALJ "could have" found on the record that the claimant was not disabled.  Moreover, a determination of "medical equivalence" presupposes a claimant does not satisfy the relevant Listing in all respects.  In particular, a claimant may medically equal a listing by demonstrating an impairment contained in the Listings (e.g., autistic disorder or other pervasive developmental disorder) which exhibits all of the findings (e.g., the relevant "A" criteria and two of the four "B" criteria) but one or more of the findings (e.g., concentration, persistence, or pace) is not as severe as specified in the particular listing (e.g., "marked"), if the claimant has other findings related to his impairment (e.g., depression) that are at least of equal medical significance to the required criteria.  *See* 20 C.F.R. § 416.926.  But the ALJ did not discuss whether Plaintiff had any analogous or similar impairments that might support a finding of equivalence.  Indeed, the ALJ provided no discussion how, if at all, Plaintiff's diagnosed depression impacts the "meets" or "medically equals" analysis.  On January 22, 2009, Dr. Atkins, a psychiatrist who had treated Plaintiff for four years,[8] wrote a letter stating that Plaintiff "is

---

[8]Plaintiff makes a very cursory argument that Dr. Atkins is a treating source and that his opinion is entitled to controlling weight under the treating source rule.  (Pl.'s Mot. Summ. J. at 18.)  This may be so, and the ALJ should address the issue on remand.  (And, if the ALJ determines that Atkins is a treating source, he should provide "good reasons" for the weight he gives Dr. Atkins' opinion.  *See generally, Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).)  Here,

diagnosed with Asperger's syndrome *with depression and emotional lability*." (Tr. 276 (emphasis added).) Moreover, Plaintiff's depression was noted elsewhere in the record, including in the psychological evaluation completed by Dr. Friedman – "[M.G.] displayed moderate levels of depression, and he was most notably elevated on anhedonia and negative mood" (Tr. 259) – and by Liesen – "[a]ppearing sad (e.g., crying, withdrawn, etc.); refusing desirable activities, self talk about wishing he was not alive, preservative interest on people who have pas[sed] away, frequent isolation" (Tr. 296). Further, Plaintiff was prescribed, presumably by Dr. Atkins, several anti-depressants. (Tr. 116, 144.) Although the ALJ did note Dr. Atkins' opinion in his discussion of functional equivalence, he did not discuss his diagnosis of depression, and it is unclear from the narrative whether the ALJ accounted for Plaintiff's depression in his "meets" or "medically equals" analysis.

In short, this Court finds that there is sufficient "evidence favorable to the claimant that the ALJ simply failed to acknowledge," *see Rabbers*, 582 F.3d at 657, such that the Court cannot confidently say that "remand would be an idle and useless formality," *see Wyman-Gordon*, 394 U.S. at 766 n.6.

---

however, the issue need not be resolved. This Court is already recommending remand because of the ALJ's "meets" and "medically equals" analysis and Plaintiff has not argued how Dr. Atkins' opinion – which provided no specific functional limitations – affects the ALJ's functional equivalence analysis.

### 2. Plaintiff Has Not Established That the ALJ's Functional Equivalence Findings Are Not Supported By Substantial Evidence

Unlike the "meets" or "medically equals" analysis, the ALJ's narrative does provide (limited) reasoning for his functional equivalence determination and makes findings of fact in each of the six domains. Plaintiff asserts, however, that substantial evidence does not support the ALJ's conclusion that Plaintiff had "no limitation" in the functional domain of "acquiring and using information." (Pl.'s Mot. Summ. J. at 18-19; Tr. 32.)

In relevant part, the regulations provide the following description of the "acquiring and using information" domain:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. . . .  You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.
> . . . .
> The following examples [that may or may not be apply to your age or developmental stage:]  . . .  (i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night. (ii) You cannot rhyme words or the sounds in words.  (iii) You have difficulty recalling important things you learned in school yesterday.  (iv) You have difficulty solving mathematics questions or computing arithmetic answers.  (v) You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g)(2), (3).

To establish that substantial evidence does not support the ALJ's determination that Plaintiff had "no" limitation in the "acquiring and using information" domain, Plaintiff points to the "Teacher Questionnaire" completed by McFadden.  (Tr. 131-38.)  But in this particular domain, McFadden found that Plaintiff had "no problem" in a majority of subcategories, including: understanding

29

school and content vocabulary, reading comprehension, comprehending and solving math problems,

recalling and applying previously learned material, and learning new material.  (Tr. 132.)  Further,

according to McFadden's questionnaire, Plaintiff only had "an obvious problem" in two

subcategories and no "serious" or "very serious" problems in any subcategory.  Thus, arguably,

McFadden's questionnaire could favor a finding that Plaintiff had a less-than-marked limitation in

the acquiring-and-using-information domain.  To this the Court adds that the ALJ supported his legal

conclusion in this domain by discussing evidence of record: numerous math and verbal IQ-type test

results demonstrating that Plaintiff performed well above average.  (Tr. 32.)  Further, the Court notes

that Liesen, in developing Plaintiff's "Person Centered Plan" noted that Plaintiff

> taught himself to read at a very early age and prides himself in his
> advanced reading ability. . . . [M.G.] loves to learn about history and
> can pull extraordinary detailed facts into conversation.
> Academically, he is quite capable in all subjects though difficulties
> with organization and time management can mask his abilities and
> negatively influence his grades.

(Tr. 286.)  The Court does not doubt that Plaintiff's mental impairments limit his functioning in

some of the other domains, but in the domain of "acquiring and using information," substantial

evidence supports the ALJ's determination that Plaintiff had a less-than-marked limitation.[9]

### 3.  Any Error In The ALJ's Credibility Analysis Is Subsumed By This Court's Prior Findings

Plaintiff makes a cursory argument regarding credibility.  (Pl.'s Mot. Summ. J. at 17.)  As

an initial matter, the Court notes that the ALJ found Ms. G. and Liesen's testimony credible.  (Tr.

---

[9]The Court recognizes that the ALJ found "no" limitation in this domain and that Plaintiff asserts that this was error.  But even if substantial evidence does not support the non-existence of a limitation in the acquiring-and-using-information domain, substantial evidence supports a finding of less than "marked."  As such, any error here makes no causal difference in the ALJ's functional equivalence analysis.

31.)  Apparently then, Plaintiff takes issue with the ALJ's finding that "when [the hearing testimony is] considered along with the documentary evidence" the evidence is "not indicative of an impairment of qualifying severity."  (Tr. 31.)  But to the extent that Plaintiff asserts that this legal conclusion was reached in error because the ALJ incorrectly determined that Plaintiff's impairments did not "meet" or "medically equal" a Listing, the Court has already concluded that remand on that issue is warranted.  And to the extent that Plaintiff argues that this legal conclusion is in error because the ALJ's functional equivalence analysis was flawed, Plaintiff has only pointed to one functional domain where the ALJ purportedly erred, and this Court has also already addressed that issue.

### G.  Conclusion

For the foregoing reasons,  this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.  On remand, the ALJ shall articulate which Listing(s) Plaintiff's impairments are being compared to, and make factual findings pertaining to the criteria within those Listing(s).  Although this Court does not recommend requiring the ALJ to revisit his functional equivalence analysis, to the extent that the ALJ's more thorough analysis of the record leads to factual findings that would materially affect the existing functional equivalence analysis, the ALJ should alter that analysis accordingly.  *See Sorenson v. Astrue*, No. 10-C-0582, 2011 WL 1043362, at *9-11  (E.D. Wis. Mar. 18, 2011) (remanding in part because the ALJ's meets and medically equals analysis was "perfunctory," and noting, "Plaintiff criticizes the ALJ's discussion of the other [functional] domains as long on recitation and short on reasoning.  Because the ALJ need only minimally articulate her

31

reasoning . . . these arguments may not constitute an independent basis for reversal and remand. However, given the need to re-evaluate credibility and the Listings, as discussed above, it would behoove the ALJ on remand to offer better explanations on the other domains.").

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: September 2, 2011

32

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 2, 2011.

s/Jane Johnson
Deputy Clerk